ESTATE OF MERLIN H. AYLESWORTH, DECEASED, CAROLINE ANDREWS McENTEER AYLESWORTH, EXECUTRIX, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 47581, 47582, 54591. Filed April 29, 1955.

*Ernest R. Mortenson, Esq.*, for the petitioners.
*Maurice E. Stark, Esq.*, for the respondent.

OPINION.

RAUM, *Judge:* 1. Petitioners contend that they are entitled to business deductions in each of the taxable years equivalent to the $2,000 monthly payments decedent received from Ellington. They argue that the decedent was personally acquainted with many prominent persons and executives of many of America's largest corporations; that a man in his position was expected to entertain on a lavish scale; that the decedent had expenses other than those charged to the Ellington account which were entered in his regular books; that the funds in the Ellington account were not included in the regular books kept by decedent but were handled in a separate checking account; that although checks were drawn on the Ellington account for items which might be considered personal, reimbursements or other deposits were made to take care of them; and that the disallowance by the respondent of all the amounts charged to the Ellington account was purely arbitrary.

The petitioners had the burden of proving that they were entitled to business deductions for the taxable years in addition to those allowed by the respondent. Decedent filed an individual income tax return for 1947. Petitioners submitted no evidence from which we

can find that he was entitled to any business deductions, in addition to those already allowed by the respondent, because of any expenditures made from the $8,000 received from Ellington during that year.

For the years 1948 to 1951, inclusive, decedent and his wife claimed business deductions in their returns for those years ranging from $15,754.60 to $20,013. Additional deductions were claimed for contributions and miscellaneous items. Respondent allowed all of the business deductions claimed in these returns. Petitioners made no attempt to prove that any expenditures made from the Ellington account for business purposes were not included in the business deductions allowed for the taxable years. They introduced in evidence bank ledger sheets, checks drawn against the Ellington account, and a detailed schedule showing the number, payee, and amount of the checks charged against it. Decedent's secretary testified by deposition and was asked to explain the nature of the various expenditures made from the account. She was able to explain the purpose of some of the expenditures from the names of the payees appearing on the checks. Her explanation of many of these expenditures indicated that they were of a personal nature. As to others that may have been of a business nature, such as auto expenses, office expenses, etc., there was no convincing evidence that such items had not been included in the amounts claimed in the returns and allowed by the respondent as business deductions in each of the taxable years. In a few instances the account was reimbursed for charges of a personal nature, such as for furnishings for apartment, but in most instances where the personal nature of withdrawals was established, there does not appear to have been any reimbursement. The witness had no knowledge of the nature of many of the expenditures or of the purpose for which the decedent expended the substantial amount of cash withdrawals he made from the account each year. The rental of the New York apartment, which was used as living quarters by decedent and his wife, was not a business expense even though it may have been used at times for entertainment of business guests. Where entertainment expenses are proximately related to a taxpayer's business, they may be deductible, but the general statements made by petitioners' witnesses with respect to entertainment for business purposes do not convince us that to the extent that such expenses were properly deductible they were not already included in the deductions claimed and allowed by the respondent in each of the taxable years. After a careful consideration of the evidence, we hold that the petitioners have not proved that the respondent erred in failing to allow additional business deductions for the taxable years because of expenditures made from the Ellington account.

2. The second issue relates to the gains derived by the decedent in 1949 and 1950 upon the redemption of the class A and class B pre-

ferred stock of Ellington. Each of these blocks of stock was purchased by decedent at the nominal amount of $25, and each was redeemed at $50,000 as originally contemplated. Petitioners contend that the difference, $49,975, represents capital gain during each of the years 1949 and 1950, whereas the Commissioner takes the position that the profit in fact consists of earnings derived by the decedent from Ellington which are taxable as ordinary income rather than as capital gain. We think that the facts in this case abundantly support the conclusion that these were not bona fide capital transactions, and that they were merely a device for compensating the decedent in part for his services in connection with bringing in and maintaining the Cities Service account for Ellington.

It is important in this connection to read the entire letter of September 10, 1947, set forth above in our findings. That letter constituted the basic agreement between the decedent and Ellington. It plainly shows that the financial advantages spelled out therein for decedent's benefit were intended as compensation to him for his efforts in connection with the Cities Service account; and that such rewards were predicated upon a minimum annual revenue of $212,000 from the Cities Service account. Indeed it was clearly indicated that if such revenue were not received and not replaced by other accounts there would be an appropriate downward revision of the amounts obtainable by decedent on account of the preferred stock. The preferred stock itself was sold to the decedent at a nominal cost of 5 cents a share, although redemption was to be at the rate of $100 a share. The two blocks of preferred stock involved—class A and class B—were unique. No other shares of class A or class B preferred stock were issued to anyone else. Dividends were not payable upon such stock, and the shares were kept in escrow. It is all too plain that such stock was tailored for a special purpose, namely, to provide the vehicle for paying additional compensation to the decedent in 1949 and 1950, and that the issuance and redemption of the preferred stock were merely a sham. The various cases cited by petitioners dealing with stock options are not pertinent to the facts involved herein. The amounts in controversy here were in truth and in fact compensatory in nature and were not mere capital gains.

Nor do we accept petitioners' alternative contention that the amounts were income in 1947 rather than in 1949 and 1950. The decedent's rights in relation to the stock and payments ripened only with the passage of time and the receipt of the anticipated revenue from the Cities Service account. The payments to the decedent were in fact made in 1949 and 1950, as originally planned. He was on the cash basis, and, in any event, his rights thereto did not accrue until the time of payment. We hold that the amounts in question were ordinary income and were chargeable to the decedent in 1949 and 1950.

3. Petitioner Caroline Aylesworth contends that she is not individually liable for any of the deficiencies found to be due for the taxable years 1948 to 1951, inclusive, because her signature on the returns filed for those years was procured by fraud and duress.

In petitions filed in these proceedings on April 3, 1953, with respect to the years 1948 and 1949, and on September 9, 1954, with respect to the years 1950 and 1951, Caroline Aylesworth alleges that she married the decedent on July 1, 1945, that beginning with January 1, 1946, he inflicted intolerable cruelty upon her; that this cruelty continued up to and including 1952; that she was in constant fear of the decedent and by reason of such cruelty and fear, she was compelled by him to sign the returns filed for the years 1948 to 1951, inclusive; that the signing was not her free act; and that her signatures on the returns were procured by force and duress.

Caroline Aylesworth testified at the trial. From her testimony it appears that at times during the years she was married to the decedent he drank alcoholic beverages to excess and then when intoxicated he abused, mistreated, and threatened her. Just how often this occurred is not clear. Nor is it clear that he indulged in any such conduct at times other than when he was intoxicated. Some specific instances of abuse and mistreatment mentioned by her had no connection with the filing of any of the joint income tax returns.

Beginning in 1948 the split income provisions were enacted into law thereby enabling married couples to obtain favorable tax treatment by filing joint returns. Plainly, the decedent's desire to file joint returns beginning with 1948 was with a purpose to take advantage of the new law. Mrs. Aylesworth's testimony, however, indicated a reluctance on her part to sign the returns because the returns reported a "salary" paid to her. Such "salary" was in fact paid to her, but since she performed no services therefor she resented being designated as an employee of her husband and felt that it was done to humiliate her. The reporting of such salary had no effect taxwise on the joint returns because, to the extent that it was ascribed as income to Mrs. Aylesworth, there was a corresponding deduction with respect to the decedent's business expenses, and the two items would thus neutralize each other.

The record contains evidence suggesting numerous ugly incidents which occurred between the Aylesworths. In connection with the 1948 return she testified:

He told me if I did not sign it, that I would be very, very sorry. He told me that he would destroy my father. He told me that he would mutilate my face, and when I told him I would divorce him rather than sign it, he said, "You haven't got a chance. I will go to Bruce Bromley and see—I will go anywhere, to everyone, and your word against Merlin Aylesworth's will never stand." And I think he was probably right.

She testified that when she signed the 1949 return she was "just a wreck" and was still being threatened. She made no similar statement as to the threats made or the state of her mind when she signed the 1950 return, except that, in response to a question whether the signing of that return was "a free act on * * * [her] part," she replied, "It was not."

In connection with the 1951 return, the evidence discloses a tempestuous episode in the evening of April 8, 1952, when the decedent had much to say about his wife's failure to sign the returns. The decedent was then very inebriated. He was abusive, he tore her clothes, and pulled her hair so severely that some came out. She, on the other hand, countered with a hat pin, and summoned police assistance. The following morning, April 9, 1952, she went to decedent's office and signed the 1951 return on his secretary's desk and in her presence. She did not see the decedent that morning or at any time thereafter until August 1952 at a hospital a short time prior to his death.

We cannot hold that Mrs. Aylesworth's signature on the 1948–1951 joint returns must be treated as a nullity. There is no evidence that she filed any separate returns on her own behalf for any of those years, notwithstanding that, at least for the year 1951, she realized $17,500 in income as capital gain. She continued to live with the decedent and indeed contributed her own property and funds towards the construction of their Connecticut home, after the alleged coercive acts during some of the years had taken place. Moreover, she began to consult legal counsel as early as 1949 about her marital difficulties. The filing of joint returns resulted in a substantially reduced tax burden for the couple as a result of the split income provisions, and we should be very slow to conclude that the signature of the wife is to be regarded as having been obtained by fraud or duress. We are not convinced on the evidence before us that her signature was not voluntary, regardless of her reluctance to sign and regardless of the domestic frays that may have occurred at about the time. We are of the opinion that when she in fact signed the returns they were her voluntary, although perhaps distasteful, acts. So far as we know she never undertook to disavow her signature on any of the returns within a reasonable time so that the Government might promptly have proceeded against the husband for increased tax by reason of the higher brackets that would be applicable to his individual return; and, as noted above, she filed no separate return of her own, particularly for the year 1951. We find and hold that her signature on each return in question was not procured by duress or fraud, and that section 51 (b) of the Internal Revenue Code of 1939 providing for joint and several liability of the spouses on a joint return is applicable here.

4. The final issue relates to the respondent's disallowance of a portion of the amounts claimed in the joint returns as deductions for traveling and entertainment expenses for 1947, for contributions for the taxable years 1947 to 1951, inclusive, for a loss by theft in 1949, and for sales tax for 1951. The respondent's determination was based upon the petitioners' failure to substantiate the expenditures claimed to the extent of the disallowances. Decedent's secretary testified that the figures shown in the returns for the deductions claimed were given to her by the decedent. The loss by theft will be hereinafter considered. As to the other items, no convincing evidence was introduced to substantiate the deductions claimed in the returns and to establish that the respondent erred in disallowing a portion of them. In these circumstances we must hold that the petitioners have not sustained their burden of proving that the respondent's disallowance of a portion of the deductions claimed was erroneous.

In the 1949 return a loss from theft of a fitch cape in the amount of $600 was claimed as a deduction. Caroline Aylesworth testified that she purchased this cape with her own money in 1945 or 1946 for $500 and that it was in very good condition when it was stolen on December 24, 1949. She was unable to explain why a loss of $600 was claimed in the 1949 return for a cape that cost $500. The respondent disallowed $250 of the amount claimed. In view of the fact that the cape was 3 or 4 years old at the time it was stolen, we think his action was reasonable and it is approved.

*Decisions will be entered for the respondent.*